J-S69031-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GARY GARRISON | : | |
| | : | |
| Appellant | : | No. 806 MDA 2018 |

Appeal from the Judgment of Sentence December 20, 2017
In the Court of Common Pleas of Lebanon County Criminal Division at
No(s): CP-38-CR-0000515-2017

BEFORE: BENDER, P.J.E., LAZARUS, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.: **FILED NOVEMBER 02, 2018**

Gary Garrison (Appellant) appeals from the judgment of sentence imposed after a jury convicted him of false imprisonment, and the trial court convicted him of summary harassment.[1] On appeal, Appellant challenges the sufficiency of the evidence supporting his convictions. We affirm.

In addition to false imprisonment and summary harassment, Appellant was charged with simple assault and recklessly endangering another person. The charges were filed as a result of an incident between Appellant and his former fiancé, Judith Howard. A jury trial commenced on November 1, 2017. Relevant to Appellant's sufficiency claims, the trial court at length and with accuracy recounted the evidence presented at trial as follows:

_____

[1] 18 Pa.C.S.A. §§ 2903(a), 2709(a).

Ms. Howard testified that on December 30, 2016, she and [Appellant] first attended a party at a community center for a friend's son before heading to Duke's Bar and Grill in Hershey to watch a sporting event. While at Duke's, Ms. Howard and [Appellant] argued some throughout the night, but the situation escalated when Ms. Howard received the bill for the evening and noticed that [Appellant] had ordered $60 worth of alcoholic drinks that Ms. Howard was unaware of, and she refused to pay the bill for the drinks. When Ms. Howard refused, [Appellant] became irritated and aggravated and told Ms. Howard to find her own way home. Ms. Howard then proceeded to walk out of the bar and intended to call her mother for a ride. Ms. Howard testified that as she was walking through the parking lot, [Appellant] was walking behind her and when she passed [Appellant's] car, not intending to get into the car, [Appellant] grabbed Ms. Howard and pushed her toward the car. When they arrived at the passenger side of the car, [Appellant] opened the door, shoved Ms. Howard into the car and closed and locked the door. Ms. Howard then attempted to open the door and get out of the car, but [Appellant] stepped around and pushed Ms. Howard back into the car. When Ms. Howard again tried to open the door, [Appellant] was in the driver's side of the car and he began to drive.

As they began driving, Ms. Howard stated that [Appellant] started "driving really, really fast and then stopping and then really, really fast and stopping." As [Appellant] was doing this, Ms. Howard's purse fell onto the floor in front of her. Ms. Howard then released her seat belt to retrieve her purse, but [Appellant] continued the stop-and-go movement of the car, causing Ms. Howard's head to hit the glove compartment. Ms. Howard reached for the door handle in an attempt to get out of the car when she alleges that [Appellant] grabbed her around her neck, holding her head in a tight headlock until they reached her house.

When they arrived at Ms. Howard's house, both Ms. Howard and [Appellant] exited the vehicle. [Appellant] then shoved Ms. Howard against the car as Ms. Howard protested and demanded that [Appellant] leave. Ms. Howard continued to her front door and began digging for her keys when [Appellant] came up behind her and started punching her in the backside between her thigh and buttocks at least four times. Once Ms. Howard was able to open her door, [Appellant] grabbed Ms. Howard from behind and pushed her into the kitchen where he slammed her against the kitchen counter. Ms. Howard fell to the ground as [Appellant]

continued to verbally berate her. Ms. Howard got up from the ground and pushed [Appellant] and in so doing, scratched [Appellant's] forehead with her nail. [Appellant] then hit Ms. Howard in the face and blood began to gush from her nose. Ms. Howard then leaned over her couch and reached for her phone to call 9-1-1, but [Appellant] grabbed the phone away and threw it against the wall.

When law enforcement eventually responded to the scene, the officers asked if she wanted to press charges against [Appellant]. Ms. Howard explained that she felt very emotional and scared because she had been in a two-year relationship with [Appellant] and therefore did not press charges immediately. After the officers and [Appellant] left, Ms. Howard contacted her mother, who came over, and she noticed that she had been injured during the incident. Specifically, she ha[d] sustained three puncture wounds on her thigh and buttocks area with bruising as well. After a few days, Ms. Howard decided that she did want to press charges and contacted the police department.

On cross-examination, Ms. Howard admitted that subsequent to the incident in December, she had contact with [Appellant], including a phone call in early February and a Facetime call in early March. Ms. Howard also admitted that she had exchanged text messages and met up with [Appellant] twice in March.

The Commonwealth next called Jennifer Taylor to testify. Ms. Taylor is a long-time friend of Ms. Howard and has known [Appellant] since he and Ms. Howard began dating. Ms. Taylor continued that on December 31, 2016, she received a text message from [Appellant] indicating that he "acted out of line" the night before and that he was "going to stop drinking" as a result.

The Commonwealth then called Terrance Lewis, the general manager of Duke's Bar and Grill, who authenticated surveillance camera footage that was later played for the jury. The surveillance video was then presented to the jury. On the video, Ms. Howard is seen walking in the parking lot as [Appellant] walks up alongside of her, wraps his arm around her and pulls her over to the vehicle. [Appellant] opens the car door and settles Ms. Howard into the vehicle. [Appellant] is then seen attempting to close the door, but the door does not close and [Appellant] reaches into the vehicle for several seconds before closing the

door again. After closing the door, [Appellant] walks around the car and enters the driver's side door before backing the car up and pulling out of the parking lot.

Officer Nicholas Ague ("Officer Ague") of the North Londonderry Police Department was next called to testify for the Commonwealth. Officer Ague testified that he knew [Appellant] as a trainer through the K-9 academy. Officer Ague then stated that in the early morning hours of December 31, 2016, he responded to an open line 9-1-1 call to Ms. Howard's address. Upon arriving, Officer Ague first listened at the front door and heard a female sobbing and then rang the doorbell, to which Ms. Howard answered. Officer Ague observed that Ms. Howard was limping and had a bloodstain on her leg and the skin around her neck was red. When Officer Ague inquired as to whether anyone else was in the house, Ms. Howard said that [Appellant] was upstairs and [Appellant] came down the stairs shortly thereafter. Officer Ague accompanied Ms. Howard outside and across the street whereupon Ms. Howard told Officer Ague that [Appellant] had struck her three times in the leg and made contact with her nose. When asked about the redness around her neck, Ms. Howard did not answer. Then Officer Ague asked whether Ms. Howard wanted to press charges and Ms. Howard was hesitant and unsure of what she wanted to do. Officer Ague asked her to think about it and when he returned with the Non-Arrest form, Ms. Howard signed it. [Appellant] also signed a Non-Arrest form the same night.

Officer Ryan Zerbe ("Officer Zerbe") of the North Londonberry Police Department testified that on December 31, 2016, he responded to the call to Ms. Howard's residence and upon arriving, spoke with [Appellant]. Officer Zerbe noticed that [Appellant] had a cut on his forehead and asked how he received the cut, to which [Appellant] responded that he fell.

Officer Theresa Mack ("Officer Mack") of the South Londonderry Police Department testified that she first contacted Ms. Howard on January 3, 2017, after Ms. Howard left a message requesting to speak with a female police officer. Officer Mack contacted Ms. Howard by phone and Ms. Howard described the incident and requested that Officer Mack come to her house because she felt intimidated coming to the police station. Upon Officer Mack's arrival at Ms. Howard's home, Ms. Howard notified Officer Mack that she now wanted to file charges against

- 4 -

[Appellant]. Officer Mack then took Ms. Howard's written and verbal statements, took photographs of Ms. Howard's injuries, and photographs of the text messages from [Appellant] on Ms. Taylor's cell phone. Officer Mack later retrieved some articles of clothing from Ms. Howard from the night of the incident, as well as surveillance video that Ms. Howard had obtained from Duke's.

[Appellant] then testified that after picking Ms. Howard up at her house, the two proceeded to the party, where [Appellant] had one mixed alcoholic drink and Ms. Howard had more than one beer. [Appellant] stated that the two, along with Ms. Howard's mother, then went to an open house at the 911 Rapid Response for about an hour to an hour and a half. After dropping [off] Ms. Howard's mother, [Appellant] and Ms. Howard then returned to Ms. Howard's house, before leaving for Duke's around 10:00 P.M. Over the course of the evening, [Appellant] postulated that he had consumed approximately five alcoholic drinks and a shooter, while he proposed that Ms. Howard had more than him since she tended to drink faster. [Appellant] did not recall any argument over the bar tab, but indicated that he was upset that day because a State Trooper had been killed that day, and that he and Ms. Howard were bickering in the parking lot with [Appellant] wanting to leave and Ms. Howard wanting to stay at the bar.

[Appellant] testified that as he and Ms. Howard were walking in the parking lot, Ms. Howard started to walk into the middle of the parking lot where another vehicle was pulling out of a parking spot. [Appellant] then pulled Ms. Howard, who [Appellant] alleges was drunk, to his car and positioned her into the seat. As Ms. Howard sat inside the car and [Appellant] was attempting to shut the door, her foot came out and [Appellant] helped put Ms. Howard's foot back into the car and then proceeded to the driver's side and they drove away. [Appellant] next explained that the door locks on his car can be unlocked through pulling the knob and by pulling the door handle and he did nothing to disable Ms. Howard's ability to leave the car.

[Appellant] then testified that the two continued to argue while they were driving to Ms. Howard's home, and that Ms. Howard had attempted to open the door as they were driving, but denied speeding up and slamming on the brakes or that Ms. Howard hit her head on the dashboard. [Appellant] also denied putting Ms. Howard in a headlock during the drive. [Appellant] claimed that Ms. Howard attempted to grab the steering wheel

several times and cause the vehicle to move into the other lane, at which point, he would apply the brakes.

When they arrived at Ms. Howard's house, both [Appellant] and Ms. Howard continued into Ms. Howard's house where the argument resumed in the kitchen. [Appellant] alleged that Ms. Howard put him in a headlock and was scratching his face when he punched her in the right side of the thigh in order to get her to release him. [Appellant] claims that he did not realize that he still had his keys in his hand when he punched Ms. Howard. [Appellant] denied hitting Ms. Howard in the face or anywhere other than her thigh on the evening of the incident.

Trial Court Opinion, 5/3/18, at 1-7 (citations to notes of trial testimony omitted).

Appellant was convicted of false imprisonment and summary harassment.[2] On December 20, 2017, the trial court sentenced Appellant to 12 months of probation and ordered him to pay a $200 fine and costs as to false imprisonment; for summary harassment, the trial court ordered Appellant to pay a $50 fine and costs. Appellant filed a timely post-sentence motion which was denied by operation of law. This appeal followed. Appellant presents the following issues:

I.    During the course of the trial, did the Commonwealth present evidence sufficient to prove beyond a reasonable doubt that [Appellant] knowingly did restrain Judith Howard unlawfully so as to interfere substantially with her liberty?

II.   During the course of trial, did the Commonwealth present evidence sufficient to prove beyond a reasonable doubt that [Appellant] intentionally harassed Judith Howard?

_____

[2] The jury returned not guilty verdicts on the simple assault and recklessly endangering another person charges.

- 6 -

Appellant's Brief at 3.

Our standard of review in assessing a challenge to the sufficiency of the evidence is well-settled:

> In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the fact finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt.

***Commonwealth v. Diamond***, 83 A.3d 119, 126 (Pa. 2013) (citation omitted). "Any doubts concerning an appellant's guilt [are] to be resolved by the trier to fact unless the evidence was so weak and inconclusive that no probability of fact could be drawn therefrom." ***Commonwealth v. West***, 937 A.2d 516, 523 (Pa. Super. 2007), ***appeal denied***, 947 A.2d 737 (Pa. 2008).

In his first issue, Appellant argues that he was improperly convicted of false imprisonment because the evidence "does not support a finding that Howard was forced into [Appellant's] vehicle and restrained in it without her consent for the short 5 to 8 minute drive to her house." Appellant's Brief at 4. He references the criminal complaint in which the Commonwealth alleged that Appellant "did force Judith Howard into a vehicle and/or locked it without her consent." Appellant emphasizes that Ms. Howard initially "made no effort to exit the vehicle," and also avers that he "could not pull over to let Howard out because she was intoxicated, there was no sidewalk, and the road was

narrow and under construction at the time." Appellant's Brief at 15-16. We are not persuaded by Appellant's argument.

Appellant recognizes that an individual commits false imprisonment if "he knowingly restrains another unlawfully so as to interfere substantially with h[er] liberty." 18 Pa.C.S.A. § 2903(a). However, as the Commonwealth points out, "Appellant excludes all of the testimony of Ms. Howard where she states that Appellant used force or pushed her to get into the vehicle, restraining her therein, and relies solely on the narrative provided by the Appellant." Commonwealth Brief at 13.

We have explained:

> In determining the magnitude of restraint necessary for false imprisonment, this Court has recognized that false imprisonment covers restraints which are less serious than those necessary for the offenses of kidnapping and unlawful restraint. In determining whether the restraint at issue interfered with [the victim]'s liberty "substantially," we give the word "substantially" its plain meaning. 1 Pa.C.S.A. § 1903 (words in a statute are to be construed according to rules of grammar and according to their common and approved usage). Thus, we determine the Legislature intended false imprisonment to cover restraints where an individual's liberty is interfered with in an ample or considerable manner. **See** Merriam Webster's Collegiate Dictionary 1174 (10th ed.1997).

**In re M.G.**, 916 A.2d 1179, 1181–82 (Pa. Super. 2007) (internal citations and footnotes omitted). In this case, after hearing the testimony of multiple witnesses including Appellant and Ms. Howard, the jury found that Appellant restrained Ms. Howard and substantially interfered with her liberty. As the trial court explained, Ms. Howard "testified that [Appellant] grabbed her and pushed her into his vehicle . . . When she tried to step out, [Appellant] pushed

her leg back into the vehicle and then got into the driver's side and drove the vehicle away . . . on the way to her house, [Appellant] placed her in a headlock after she threatened to get out of the vehicle." Trial Court Opinion, 5/3/18, at 10. Accordingly, there was sufficient evidence for the jury to convict Appellant of "knowingly restraining" Ms. Howard and "substantially interfering with her liberty."

In his second issue, Appellant assails his conviction of summary harassment on the basis that he did not "intend to harass" Ms. Howard. Appellant's Brief at 16-19. Again, Appellant concedes the elements of the crime. An individual commits summary harassment if he, "with intent to harass, annoy or alarm another ... strikes, shoves, kicks or otherwise subjects the other person to physical contact, or attempts or threatens to do the same[.]" 18 Pa.C.S.A. § 2709(a)(1). "An intent to harass may be inferred from the totality of the circumstances." *Commonwealth v. Cox*, 72 A.3d 719, 721 (Pa. Super. 2013) (citation omitted).

Appellant argues that the jury's determination that he was not guilty of simple assault or recklessly endangering another person supports his assertion that "the jury did not find Howard's testimony on the alleged physical contact to be credible and found that any physical contact was a result of [Appellant] acting in self defense," and that likewise, Appellant could not be guilty of harassment. Appellant's Brief at 19. This argument is meritless. First, we note that it is based on conjecture. Neither Appellant, the trial court,

nor this Court know the basis for the jury's not guilty verdicts. We cannot make any inferences. It is well settled that inconsistent verdicts are permissible, and:

> Pennsylvania courts . . . have long recognized that jury acquittals may not be interpreted as specific factual findings with regard to the evidence, as an acquittal does not definitively establish that the jury was not convinced of a defendant's guilt. Rather, it has been the understanding of . . . the courts of this Commonwealth that an acquittal may merely show lenity on the jury's behalf, or that the verdict may have been the result of compromise, or of a mistake on the part of the jury.

*Commonwealth v. Moore*, 103 A.3d 1240, 1246 (Pa. 2014).

Further, it was the trial court that convicted Appellant of summary harassment, not the jury. The court referenced Ms. Howard's testimony that Appellant "grabbed," "shoved," "put her in a headlock" and "punch[ed]" Ms. Howard. Trial Court Opinion, 5/3/18, at 10-11. The court specifically stated that it "found Ms. Howard's testimony to be more credible than that of [Appellant]." Accordingly, there was sufficient evidence for the trial court to convict Appellant of having the "intent to harass, annoy or alarm" Ms. Howard by striking and shoving her and otherwise subjecting her "to physical contact."

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/2/2018

- 10 -